# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:11-CR-26-TLS |
| | ) | |
| CHARLEY J. GONZALEZ, III, BILLY J. | ) | |
| GONZALEZ, ALEJANDRO V. LUNA, | ) | |
| AUGUSTINE L. LUNA, JOSEPH LUNA, | ) | |
| NARCISO G. SOTO, III, and ANTONIO | ) | |
| ANGEL RAY FLORES | ) | |

## OPINION AND ORDER

This matter is before the Court on Defendant Charley Gonzalez's Motion to Suppress [ECF No. 125], Defendant Billy Gonzalez's Motion to Suppress [ECF No. 128], and Defendant Antonio Angel Ray Flores's Motion to Suppress [ECF No. 134]. In the Defendants' Brief in Support of Motion to Suppress [ECF No. 187], citing *United States v. Jones*, —— U.S. ——, 132 S. Ct. 945 (2012), the Defendants argue that their Fourth Amendment rights were violated when the FBI and its task force members attached GPS tracking units to their vehicles without first obtaining warrants. In its Response [ECF No. 198], the Government argues that, pursuant to the good faith doctrine articulated in *Davis v. United States*, — U.S. —, 131 S. Ct. 2419 (2011), investigating officers complied with binding Seventh Circuit precedent, which at the time of the investigation held that there was no search or seizure associated with the installation and use of a GPS vehicle tracker. In addition, the Government argues that the evidence gathered in this case resulted from an independent source and would inevitably have been discovered. For the reasons set forth in this Opinion and Order, the Court will deny the Defendants' Motions to Suppress.

**BACKGROUND**

By way of an Indictment [ECF No. 1] filed on March 24, 2011, the Government charged the Defendants with multiple counts of criminal activity related to the distribution of narcotics. On June 22, 2011, the Government filed a Superseding Indictment [ECF No. 66] charging that, from on or about November 11, 2010, and continuing until on or about April 12, 2011, the Defendants knowingly and intentionally conspired to distribute and possess with the intent to distribute a controlled substance, including 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, and marijuana, a Schedule I Controlled Substance in violation of 21 U.S.C. § 841(a)(1). In July 2012, Defendants Charley Gonzalez, Billy Gonzalez, and Antonio Angel Ray Flores filed motions to suppress [ECF Nos. 125, 128, & 137], challenging the Government's use of GPS surveillance throughout the course of the federal investigation that led to their arrest.

On October 17, 2012, and November 27, 2012, the Court conducted an evidentiary hearing on the Motions to Suppress. The Defendants were present and represented by attorneys Thomas O'Malley, Stanley Campbell, and Thomas Allen. The Government was represented by Assistant United States Attorney Anthony Geller. The Court heard testimony from Fort Wayne Police Department (FWPD) Officer Craig Wise; FWPD Detectives Jeffrey Ripley and Marc Deshaies; Federal Bureau of Investigation (FBI) Task Force Officers (TFO) Darrin Strayer and Chad Wagner; and FBI Special Agent James Keszei. Several exhibits were also admitted into the record. At the conclusion of the hearing, the Court took the Motions under advisement and gave the parties additional time to file briefs. The Defendants and the Government have filed briefs for this Court's consideration, and the matter is ripe for ruling.

**STATEMENT OF FACTS**

Upon consideration of the credibility of the witnesses and the examination of the evidence, the Court makes the following findings of fact.

**A.      Overview**

This case arises out of an FBI investigation into a series of drug transactions in late 2010 and early 2011. As part of their investigation, Task Force officers installed GPS units on the Defendants' vehicles and used them to track the Defendants' movements. The GPS devices were enclosed in magnetic boxes that were attached to the underside of the Defendants' vehicles, hidden from view. All of the installations took place while the Defendants' vehicles were parked in public areas. Once attached, the GPS units were powered by their own self-contained battery and did not interfere with the vehicles' battery source.

Prior to attaching the GPS units to the Defendants' vehicles, Task Force officers identified the Defendants through visual surveillance, police database searches, and wiretaps. After identifying the Defendants and their vehicles, the GPS units were attached to assist in surveillance. At the time of the investigation, based on consultation with the United States Attorney's Office, Task Force officers understood that they could install a GPS unit on a suspect's vehicle without a warrant. Moreover, Task Force officers testified that they did not intend to introduce evidence gathered through GPS surveillance. Instead, they intended to rely on evidence gathered through visual surveillance and information collected from the wiretaps. Task Force officers testified that they typically would be dispatched to conduct visual surveillance of the Defendants based on information obtained from wiretaps of the Defendants' cell phones. However, Task Force officers agreed that GPS surveillance was useful on occasion

to locate a Defendant after losing visual contact with him or to initiate visual surveillance of a Defendant if there were no incoming or outgoing communications from the Defendants' cell phones.

**B.     Testimony of FWPD Officer Craig Wise**

Officer Wise assisted the FBI in its investigation of the Defendants. As part of the investigation, Officer Wise monitored the wire and conducted surveillance of the Defendants. (Oct. 17 Hr'g Tr. 13–14.) Officer Wise's surveillance duties included installing GPS tracking devices on the Defendants' vehicles. (*Id.* 14.) In late December 2010, Officer Wise installed a GPS unit on a Dodge Charger believed to be used by Defendant Flores. (*Id.*) The GPS unit was installed while the car was parked on a public street in front of 3315 Oliver Street. (*Id.* 14–15.) TFO Wagner acted as Officer Wise's back-up during the installation process. (*Id.* 15.)

On January 15, 2011, Officer Wise and Detective Strayer conducted surveillance of a residence at 6511 Donna Drive. (*Id.* 21.) Officer Wise observed a gold Pontiac close to the residence. (*Id.*) At 2:14 PM, a Toyota Tundra stopped in front of the residence and a passenger got out and entered the residence. (*Id.*) Officer Wise and Detective Strayer subsequently followed the Toyota Tundra to East Hills Street. (*Id.*) During their surveillance of the Tundra, Officer Wise was able to identify Defendant Charley Gonzalez as the driver of the truck. (*Id.* 22.) Through continued surveillance, Officer Wise and other law enforcement agents determined that Defendant Charley Gonzalez resided at 6317 East Hills Street and that Defendant Billy Gonzalez was staying at 6511 Donna Drive. (*Id.* 22–26.)

Later that month, on January 22, 2011, based on information from the wire, Officer Wise conducted surveillance on Defendants Flores and Alejandro Luna. (*Id.* 26.) The two Defendants

were observed driving a gray-teal Dodge Charger to a gas station at the corner of Fairfield and Jefferson. (Oct. 17 Hr'g Tr. 26–27.) At the gas station, Defendant Augustine Luna drove up in a silver Cadillac and engaged in a conversation with Defendants Flores and Alejandro Luna. (*Id.* 27.) Several weeks later, on February 15, 2011, Officer Wise conducted surveillance in the area of 326 Arcadia. (*Id.*) Through prior investigation, law enforcement agents had determined that Jarvis Buchanan resided at 326 Arcadia. (*Id.*) That day, Officer Wise observed a gray-teal Dodge Charger pull up to Buchanan's residence at which time Buchanan exited the residence and got into the vehicle. (*Id.* 28.) To Officer Wise, it appeared that the parties engaged in a drug transaction. (*Id.* 28–29.)

In mid-February 2011, Officer Wise installed another GPS unit on a gold Pontiac believed to belong to Defendant Billy Gonzalez while the car was parked at a Macy's parking lot at the Glenbrook mall. (*Id.* 16.) Officer Wise also reported removing or installing a GPS unit on Defendant Charley Gonzalez's Toyota Tundra on several occasions. (*Id.* 17.) Each removal or installation of the GPS unit occurred while the truck was parked in a public area. (*Id.* 17–20.)

On cross-examination, Officer Wise described placing the GPS on the exterior of the Defendants' cars in a location hidden from view. (*Id.* 36–37.) He did not have to manipulate any part of the vehicle to attach the GPS device to it. (*Id.* 58.) The GPS units were not hard-wired into the battery of the car and had their own source of battery power. (*Id.* 66.) Further, Officer Wise explained that the GPS units did not constantly transmit the location of the vehicle to which it was attached. (*Id.* 37.) When the vehicle was stopped for a certain length of time, the GPS unit would go into sleep mode and would be re-activated upon movement of that vehicle. (*Id.*)

## C.    Testimony of FWPD Detective Jeffrey Ripley

Like Officer Wise, Detective Ripley installed and removed GPS units on vehicles used by the Defendants during the course of the FBI investigation. (*Id.* 72.) All of the installations and removals of GPS units occurred while the Defendants' vehicles were located in public areas. (*Id.*) Detective Ripley performed multiple installations and removals of GPS units throughout early 2011. (*Id.* 73–76.) In addition, Detective Ripley conducted physical surveillance of the Defendants. On March 17, 2011, Detective Ripley and TFO Alberto Martinez conducted surveillance of Defendant Charley Gonzalez at the Jefferson Pointe shopping mall. (*Id.* 77–78.) Detective Ripley observed Ormey Douglas meet with Defendant Charley Gonzalez in the passenger seat of Gonzalez's Toyota Tundra. (Oct. 17 Hr'g Tr. 78–80.) After a short meeting in the Toyota Tundra, Douglas returned to his vehicle and exited the parking lot. (*Id.* 80.) Detective Ripley trailed Douglas to his residence at 1719 Poinsette Drive.

On April 2, 2011, Special Agent James Keszei instructed Detective Ripley to attempt to locate Billy Gonzalez at his new apartment. (*Id.* 80.) Detective Ripley then traveled to the Willows of Coventry apartment complex where he observed Defendants Charley and Billy Gonzalez's vehicles. (*Id.* 80–81.) Based on his surveillance, Detective Ripley determined that Defendant Billy Gonzalez resided at 4881 Coventry Parkway. (*Id.* 82.) Detective Ripley could not recall if he used any GPS information to locate Defendant Charley Gonzalez's vehicle at the apartment complex. (*Id.* 83.)

According to Detective Ripley, there were "[m]ore than a dozen" times that he began surveillance of a suspect based on information obtained from one of the GPS transmitters. (*Id.* 99.) Detective Ripley acknowledged that there were times that he was able to continue surveillance of a suspect after losing sight of the suspect because of the use of GPS. (*Id.*) On re-

direct, Detective Ripley agreed that he had no idea how many surveillance operations were affected by the use of the GPS units. (*Id.* 101.) Further, Detective Ripley testified that the majority of surveillance operations were initiated based on information from the various wiretaps used by the FBI Task Force. (*Id.* 102.)

**D.     Testimony of FBI TFO Darrin Strayer**

TFO Strayer was involved in the installation and removal of GPS units on the Defendants' vehicles. (Oct. 17 Hr'g Tr. 111–12.) As part of the investigation, in April 2012, TFO Strayer was assigned to analyze the GPS data that was available for the Defendants' vehicles. (*Id.* 112.) The GPS units had data from December 2011 to April 7, 2012, when the last GPS units were removed from the Defendants' vehicles. (*Id.* 112–13.) TFO Strayer reviewed the data to identify any patterns in the Defendants' movements during that time period. (*Id.* 113.) According to TFO Strayer, a GPS unit could be programmed to report its location at certain intervals; longer intervals would help preserve the battery life of the unit. (*Id.* 117.) The GPS units placed on the Defendants' vehicles generally lasted about two weeks before needing to be replaced. (Oct. 17 Hr'g Tr. 117.) When the Defendants' vehicles were parked in an enclosed area, the GPS devices could not transmit information because of interference with the satellite. (*Id.* 118.) TFO Strayer also conducted visual surveillance of the Defendants during the investigation. (*Id.* 123–30.)

On cross-examination, defense counsel questioned TFO Strayer concerning the importance of the GPS units in the surveillance operation. (*Id.* 144.) TFO Strayer agreed that the GPS units were helpful in the investigation of the Defendants but opined that the wiretaps were more important than the GPS units because the wiretaps provided law enforcement agents with

specific information concerning where and when the Defendants were going to meet. (*Id.* 144–45.)

E.      **Testimony of FWPD Detective Marc Deshaies**

During the course of the investigation, Detective Deshaies managed the electronic equipment for the FWPD Vice and Narcotics Unit. (Nov. 27 Hr'g Tr. 7.) Detective Deshaies explained the process by which the GPS units transmitted their signals from the undercarriage of the Defendants' vehicles. (*Id.* 8–9.) GPS units operate based on a line of sight with the sky. (*Id.* 9.) To transmit the signal to multiple satellites, a GPS unit located under a vehicle bounces a signal off of the road surface. (*Id.*) Generally, Detective Deshaies testified, a GPS unit is accurate to within 9 to 15 feet of its actual location. (*Id.* 9–10.) If located inside an enclosed space, such as a garage, a GPS unit cannot transmit its signal and the GPS unit loses its ability to function. (*Id.* 12.) Detective Deshaies confirmed TFO Strayer's description of a GPS unit's battery life. (*Id.* 15–16.) On cross-examination, Detective Deshaies confirmed that he did not have any personal involvement in the investigation of the Defendants. (*Id.* 27.) Rather, he provided technical assistance to law enforcement agents who actually installed and removed the GPS units on the Defendants' vehicles. (*Id.*)

F.      **Testimony of FBI TFO Chad Wagner**

TFO Wagner was actively involved in the installation and removal of the GPS units from the Defendants' vehicles during the course of the investigation. (*Id.* 40.) Working as an administrative case agent, TFO Wagner also monitored the wiretaps and transcribed recordings of the Defendants' conversations from those wiretaps. (*Id.* 40–41.) To establish the identity of

callers, TFO Wagner and other law enforcement officers conducted visual surveillance at the time the tapped phones were being used. (*Id.* 41.) Additionally, TFO Wagner completed Spillman checks through a city and county computer database to obtain identifying information about the Defendants. (Nov. 27 Hr'g Tr. 42.) GPS units were not placed on the Defendants' vehicles until they were identified through some combination of visual surveillance, wiretaps, and Spillman checks. (*Id.* 42–43.)

Through a wiretap on Jarvis Buchanan's phone and visual surveillance, law enforcement agents were able to identify Defendant Flores as a distributor of narcotics. (*Id.* 46–47.) TFO Wagner testified that Defendant Alejandro Luna worked as Defendant Flores's delivery person and that Buchanan would contact Defendant Alejandro Luna to order cocaine from Defendant Flores. (*Id.* 47–48.) TFO Wagner discussed at length multiple phone calls between Defendant Flores and Buchanan during which Defendant Flores and Buchanan used coded language consistent with the sale of narcotics. (*Id.* 48–50, 51–53.) Based on their investigation, law enforcement officers identified Defendants Billy and Charley Gonzalez as the suppliers of narcotics to Defendant Alejandro Luna, Defendant Flores, Defendant Augustine Luna, and other individuals. (*Id.* 53–58, 59–60, 67–79.) Further investigation indicated that Defendant Narcisco G. Soto was storing narcotics at his residence for Defendant Alejandro Luna and Defendant Flores. (*Id.* 63–65.)

According to TFO Wagner, law enforcement agents would be dispatched to conduct visual surveillance on the Defendants based on information from the wiretaps. (*Id.* 50.) TFO Wagner further explained that they would use information from the GPS units to initiate surveillance in limited circumstances, such as if there were no incoming or outgoing calls from the Defendants' phones. (*Id.* 50–51.)

TFO Wagner explained his understanding of the law surrounding the installation of GPS devices and any subsequent surveillance. At the time the decision to use GPS surveillance was made, based on conversations with counsel from the US Attorney's Office, TFO Wagner understood that law enforcement could install a GPS unit on a suspect's vehicle without a warrant or court authorization so long as the GPS unit was installed on a vehicle in a public area. (*Id.* 96–97, 105–06.) He understood that law enforcement agents could not receive information from a GPS unit that was attached to a vehicle in an enclosed garage or private area. (*Id.* 106.) Further, he stated that the tracker data from the GPS units was never intended to be introduced into evidence and that the Task Force had instructions to conduct visual surveillance for the purposes of gathering evidence to be introduced in court. (*Id.*)

### G.     Testimony of FBI Special Agent James Keszei

Special Agent Keszei was the case agent managing the investigation of the Defendants. (Nov. 27 Hr'g Tr. 120.) As the case agent, Special Agent Keszei had a limited role in the actual surveillance of the Defendants and the installation and removal of the GPS units from the Defendants' vehicles. (*Id.* 121.) Special Agent Keszei concentrated on the management of the wiretaps of the Defendants' cellular phones. (*Id.*) Special Agent Keszei explained the process by which intercepted phone calls and text messages were transcribed. (*Id.* 121–22.) Law enforcement officers used a computer system called VoiceBox to intercept and record phone calls and text messages. (*Id.* 121.) After intercepting these communications, law enforcement officers would review the recordings of the phone calls and text messages and transcribe them into a line sheet. (*Id.*) A line sheet would include a description of the phone call or text message, the incoming or outgoing phone number, and the time and duration of the call. (Nov. 27 Hr'g Tr.

10

121) Further, each phone call or text message would generate a contact with a cell site tower, which would provide officers with the general location of the cell phone. (*Id.* 122.) The location would be available to law enforcement agents as soon as the call or text message was completed. (*Id.* 122–23.)

Special Agent Keszei received training on the use of GPS tracking units during the course of his employment with the FBI. (*Id.* 127–28.) Like TFO Wagner, Special Agent Keszei understood that GPS units could be installed on a suspect's vehicle without a warrant so long as the vehicle was located in a public area. (*Id.* 128.) Special Agent Keszei further confirmed that it was his understanding that GPS surveillance could not be gathered from a vehicle in a garage or in an enclosed private area. (*Id.*) At the outset of the investigation, Special Agent Keszei reported discussing legal issues related to GPS surveillance with counsel from the US Attorney's Office. (Nov. 27 Hr'g Tr. 177.) Further, he testified that he had daily conferences with counsel from the US Attorney's Office during the course of the investigation. (*Id.* 165.) Special Agent Keszei agreed with his colleagues that GPS surveillance helped locate suspects and that, on occasion, but for GPS surveillance, law enforcement agents would not have been able to physically track the Defendants. (*Id.* 191.)


**ANALYSIS**

The parties disagree as to whether the good faith exception to the exclusionary rule should apply in this case. *See Davis v. United States*, — U.S. —, 131 S. Ct. 2419 (2011). At the time of the investigation in this case, the Seventh Circuit had addressed the installation and monitoring of a GPS unit for Fourth Amendment purposes in its decision in *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007). Following the Defendants' arrests in the present case in

2011, the Supreme Court considered whether the installation of a GPS device on a vehicle was a search for Fourth Amendment purposes in *United States v. Jones*, ⸺ U.S. ⸺, 132 S. Ct. 945 (2012). The *Jones* Court concluded that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" *Id.* at 949. Based on *Jones*, the Defendants filed their Motion to Suppress, arguing that the GPS data collected from their vehicles should be excluded. In response, the Government maintains that *Garcia* was binding appellate precedent at the time of the installation of GPS units on the Defendants' vehicles, and that the good faith exception set forth in *Davis* should apply.

A.      ***United States v. Jones***

The Fourth Amendment protects the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In *Jones*, the Government began an investigation into the defendant because of his involvement in drug trafficking. 132 S. Ct. at 948. Based on evidence uncovered through visual surveillance and a wiretap of the defendant's phone, the government applied for a warrant authorizing the use of a GPS device on the defendant's vehicle. *Id.* Although the district court issued a warrant, law enforcement officers improperly executed the warrant. *Id.* Over a period of 28 days, the Government used the GPS device to track the defendant's movement, resulting in more than 2,000 pages of data. *Id.* Based in part on the evidence from the GPS unit that was admitted at trial, the defendant was convicted of conspiracy to distribute and possess narcotics. The defendant subsequently appealed his conviction, arguing that the warrantless installation of the GPS unit and the monitoring of his movements violated his Fourth Amendment right to be free from an unreasonable search.

At the outset of his opinion, Justice Scalia, writing for the majority, observed that "[t]he text of the Fourth Amendment reflects its close connection to property." *Id.* at 949. Continuing, Justice Scalia reviewed the history of the Court's Fourth Amendment precedents:

> [O]ur Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. *Kyllo v. United States*, 533 U.S. 27, 31 (2001); Kerr, *The Fourth Amendment and New Technologies: Constitutional Myths and the Case for Caution*, 102 Mich. L. Rev. 801, 816 (2004). Thus, in *Olmstead v. United States*, 277 U.S. 438 (1928), we held that wiretaps attached to telephone wires on the public streets did not constitute a Fourth Amendment search because "[t]here was no entry of the houses or offices of the defendants," *id.*, at 464.
>
> Our later cases, of course, have deviated from that exclusively property-based approach. In *Katz v. United States*, 389 U.S. 347, 351 (1967), we said that "the Fourth Amendment protects people, not places," and found a violation in attachment of an eavesdropping device to a public telephone booth. Our later cases have applied the analysis of Justice Harlan's concurrence in that case, which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," *id.*, at 360. *See, e.g., Bond v. United States*, 529 U.S. 334 (2000); *California v. Ciraolo*, 476 U.S. 207 (1986); *Smith v. Maryland*, 442 U.S. 735 (1979).

*Jones*, 132. S. Ct. at 949–50 (additional citations omitted). In reconciling these differing approaches, Justice Scalia emphasized that "the *Katz* reasonable-expectation-of-privacy test has been *added to,* not *substituted for*, the common-law trespassory test."[1] *Id.* at 952. A trespass alone does not qualify as a search. *Id.* at 951 n.5. Rather, to rise to the level of a search, a

---

[1] Whether the pre-*Katz* test was based on the common law of trespass is a debatable question. *See* Orin S. Kerr, *The Curious History of Fourth Amendment Searches* 2 (Supreme Court Review forthcoming 2013), available at http://ssrn.com/abstract=2154611 ("This essay explores the history of the Fourth Amendment and reaches the surprising conclusion that no trespass test was used in the pre-*Katz* era. Neither the original understanding nor Supreme Court doctrine equated searches with trespass. *Jones* purports to revive a test that did not actually exist."). Following *Jones*, the Supreme Court considered the Fourth Amendment implications of police using a drug-sniffing dog on the porch of a home to detect narcotics inside the home in *Florida v. Jardines*, — U.S. —, 133 S. Ct. 1409 (2013). Significantly, in his majority opinion, Justice Scalia did not use the word "trespass" in describing the *Jones* property-based test for what constitutes a search under the Fourth Amendment. *See* Orin Kerr, *What is the State of the* Jones *Trespass Test After* Florida v. Jardines?, (The Volokh Conspiracy Mar. 27, 2013) available at http://www.volokh.com/2013/03/27/what-is-the-state-of-the-jones-trespass-test-after-florida-v-jardines/ ("Notably, Justice Scalia nowhere uses the word 'trespass' to describe the *Jones* inquiry. Instead, he mostly sticks to the concept that the Court had used in the 1961 *Silverman* case, a few years before *Katz*, of physical penetration or intrusion into a constitutionally protected area.").

trespass must be combined with "an attempt to find something or to obtain information." *Id.*

Distinguishing the case before the Court from *United States v. Knotts*, 460 U.S. 276 (1983), and

*United States v. Karo*, 468 U.S. 705 (1984), *Jones*, 132. S. Ct. at 951–52, Justice Scalia

concluded that the Government's installation of the GPS unit on the defendant's car constituted a

search for purposes of the Fourth Amendment because "[t]he Government physically occupied

private property for the purpose of obtaining information," *id.* at 949.

Justice Sotomayor joined Justice Scalia's majority opinion but also issued a separate

concurrence. While agreeing with the majority's trespass-based analysis, Justice Sotomayor

noted that the *Katz* test "augmented, but did not displace or diminish, the common-law

trespassory test that preceded it." *Id.* at 955 (Sotomayor, J., concurring). Under the reasonable

expectation of privacy test, Justice Sotomayor agreed with Justice Alito's concurrence in the

judgment (see discussion below) that "longer term GPS monitoring in investigations of most

offenses impinges on expectations of privacy."[2] *Id.* However, Justice Sotomayor parted from

Justice Alito in her underlying reasoning. Rather than focusing on society's expectation of how

law enforcement officers would investigate criminal activity, Justice Sotomayor concentrated on

the ability of the Government to aggregate personal information at a low cost and with unfettered

discretion. *Id.* at 955–56. Continuing, Justice Sotomayor stated:

---

[2] From the concurring opinions it appears that five Justices are ready to adopt some version of the mosaic theory of the Fourth Amendment. *See* Fabio Arcila, Jr., *GPS Tracking Out of Fourth Amendment Dead Ends:* United States v. Jones *and the* Katz *Conundrum*, 91 N.C. L. Rev. 1, 62–63 (2012); Orin Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 Mich. L. Rev. 311, 313–14 (2012). Under the mosaic theory, "[i]dentifying Fourth Amendment searches requires analyzing police actions over time as a collective 'mosaic' of surveillance; the mosaic can count as a collective Fourth Amendment search even though the individual steps taken in isolation do not." Kerr, 111 Mich. L. Rev. at 313. The D.C. Circuit applied the mosaic theory in *United States v. Maynard*, finding that GPS surveillance of a suspect's car aggregated over the course of a month amounted to a search under the Fourth Amendment. 615 F.3d 544 (D.C. Cir. 2010), *aff'd sub nom. United States v. Jones*, 132 S. Ct. 945 (2012).

I would take these attributes of GPS monitoring into account when considering the existence of a reasonable societal expectation of privacy in the sum of one's public movements. I would ask whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the Government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on.

*Jones*, 132 S. Ct. at 956 (Sotomayor, J., concurring).

Concurring in the judgment, Justice Alito, joined by Justices Breyer, Ginsburg, and Kagan, criticized the majority's property-based approach, instead relying on the reasonable expectation of privacy test articulated in *Katz*. In applying the *Katz* test, Justice Alito recognized that *Knotts* authorized "relatively short-term monitoring of a person's movements on public streets," but observed that "the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." *Id.* at 964 (Alito, J., concurring in the judgment). For most criminal offenses, society did not expect that law enforcement officers would be able to track an individual's location and movement over an extended period of time, and, therefore, in Justice Alito's view, GPS surveillance of an individual's vehicle for 28 days as part of a law enforcement investigation into an unextraordinary drug conspiracy constituted a Fourth Amendment search. *Id.*

### B.      Exclusionary Rule and the Good Faith Exception

Under the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961); *Weeks v. United States*, 232 U.S. 383 (1914)). The purpose of the exclusionary rule is to deter future Fourth Amendment violations, *Herring v. United States*, 555 U.S. 135, 141 (2009) (citing *Calandra*, 414 U.S. at 347–55), and to apply the exclusionary rule, "the benefits of deterrence

must outweigh the costs," *Herring*, 555 U.S. at 141 (citing *United States v. Leon*, 468 U.S. 897, 910 (1984)). Because of its "substantial social costs," the exclusionary rule should be a court's "last resort" and not its "first impulse." *Herring,* 555 U.S. at 140–41 (quotation marks omitted).

Beginning in *Leon*, the Supreme Court has recognized a good faith exception to the exclusionary rule. *Leon*, 468 U.S. at 922 (holding that the exclusionary rule does not apply when the police conduct a search in "objectively reasonable reliance" on a warrant later held invalid); *see also Herring*, 555 U.S. at 137 (extending good faith exception where police employees erred in maintaining records in a warrant database); *Arizona v. Evans*, 514 U.S. 1, 14 (1995) (extending good faith exception where the police reasonably relied on erroneous information concerning an arrest warrant in a database maintained by judicial employees); *Illinois v. Krull*, 480 U.S. 340, 349–50 (1987) (extending the good faith exception to searches conducted in reasonable reliance on subsequently invalidated statutes). The Court expanded the exclusionary rule again in *Davis v. United States*, 131 S. Ct. 2419 (2011). In *Davis*, the defendant was arrested following a routine traffic stop. *Id.* at 2425. After being handcuffed and placed in a patrol car, the arresting officers searched the passenger compartment of the vehicle and discovered a revolver in the pocket of the defendant's coat. *Id.* At the time of the defendant's prosecution, the Supreme Court's decision in *New York v. Belton*, 453 U.S. 454, 458–459 (1981), authorized such a search. *Davis*, 131 S. Ct. at 2426. However, while the defendant's appeal was pending, the Supreme Court issued its decision in *Arizona v. Gant*, 556 U.S. 332 (2009), limiting its prior holding in *Belton*. *See Davis*, 131 S. Ct. at 2426. The Eleventh Circuit Court of Appeals applied the holding in *Gant*, and found that the search of the vehicle incident to the defendant's arrest violated his Fourth Amendment rights. *Id.* However, the Eleventh Circuit then turned to the issue of suppression, finding that it was unwarranted because the officers who had conducted the

search reasonably relied on binding appellate precedent at the time of the search pre-*Gant*. *Id.*

The *Davis* Court affirmed the Eleventh Circuit's holding. The Court considered the history of the exclusionary rule and the expansion of the good faith exception following *Leon*. *Id.* at 2426–28. In applying the good faith exception to the exclusionary rule, the *Davis* Court emphasized the lack of police culpability in the defendant's case:

> The officers who conducted the search did not violate Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any "recurring or systemic negligence" on the part of law enforcement. The police acted in strict compliance with binding precedent, and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case.

*Id.* at 2428–29 (internal citations omitted). In conclusion, the Court found that "when binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities," *id.* at 2429, and, therefore, the Court held that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule," *id.*

Justice Sotomayor issued an opinion concurring in the Court's judgment. While agreeing with the majority's conclusion that the application of the exclusionary rule was inappropriate in Davis's case, Justice Sotomayor noted that Davis's case "d[id] not present the . . . question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." *Id.* at 2435 (Sotomayor, J., concurring). Where Fourth Amendment case law is unsettled or unclear, Justice Sotoymayor observed, the Court had previously found exclusion *may* deter Fourth Amendment violations.[3] *Id.*

---

[3]District courts have varied in their interpretation of the good faith exception set forth in *Davis*. One line of cases holds that the *Davis* good faith exception does not apply absent binding precedent from the court's circuit. In contrast, a competing lines of cases focuses on the broader language in *Davis* and permits the application of the *Davis* good faith exception where officers act in reasonable

## C.      *United States v. Garcia*

The Seventh Circuit's decision in *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007), is central to the parties' arguments in this case. In *Garcia*, the defendant appealed his conviction for manufacturing methamphetamine, claiming that the evidence obtained as a result of a GPS unit attached to his car without a warrant should have been suppressed as the product of an unconstitutional search. The defendant had previously been convicted of multiple methamphetamine offenses. *Id.* at 995. Following his release from prison, he began to manufacture methamphetamine again. *Id.* Multiple informants relayed this information to law enforcement agents. *Id.* From another informant, the police learned that the defendant was

reliance on a comprehensive body of case law even in the absence of binding circuit precedent. *See United States v. Robinson*, 903 F. Supp. 2d 766, 782–83 (E.D. Mo. 2012) (comparing competing lines of cases).

Fortunately for this Court, the Seventh Circuit has addressed the application of the *Davis* good faith exception in a context similar to that at hand. In *United States v. Martin*, 712 F.3d 1080 (7th Cir. 2013) (per curiam), the defendant committed a bank robbery in Burlington, Iowa, which is located in the Eighth Circuit. *Id.* at 1080. Based on a tip, law enforcement agents were able to locate the defendant's vehicle and attach a GPS device to it. *Id.* With the aid of the GPS unit, the defendant was tracked into Illinois where a local sheriff's deputy stopped the defendant's car, revealing drugs and a revolver in the vehicle. *Id.* Based on the Supreme Court's decision in *Davis*, the district court found that suppression of the evidence was not warranted because the Iowa law enforcement officers relied on existing, but not binding, case law at the time of the installation of the GPS unit. *Id.*

On appeal, the Seventh Circuit found the district court's decision "to be an unwarranted expansion of the Supreme Court's decision in *Davis*." *Id.* Because the GPS was installed in Iowa and because there was no binding Eighth Circuit precedent at the time the GPS was installed, the Court found that the application of the *Davis* good faith exception was not appropriate. *Martin*, 712 F.3d at 1080. The *Martin* court emphasized that the literal language of *Davis* provided for the application of the good faith exception only when searches were conducted by law enforcement reasonably relying on "*binding appellate precedent.*" *Id.* (emphasis in *Martin*) (quoting *Davis*, 131 S. Ct. at 2434). Continuing, the court quoted Justice Sotomayor's concurrence in *Davis* concerning the good faith exception in the situation where the constitutionality of a search is not well-settled, and stated: "We reject the government's invitation to allow police officers to rely on a diffuse notion of the weight of authority around the country, especially where that amorphous opinion turns out to be incorrect in the Supreme Court's eyes." *Martin*, 712 F.3d at 1080. Nonetheless, the *Martin* court rejected the defendant's suppression argument because his arrest was significantly attenuated from the installation of the GPS unit on his car. *Id.* ("The evidence he seeks to suppress had little to do with the fact that a GPS device had been used at all.").

driving a borrowed Ford Tempo. *Id.* After locating the defendant's vehicle, without a warrant, officers attached a GPS unit to the rear bumper of the vehicle. *Id.* Based on a review of the location data from the GPS unit, officers learned that the defendant regularly traveled to a large tract of land. *Id.* With the permission of the land's owner, officers searched the property, discovering equipment and supplies used to produce methamphetamine. *Id.* While searching the tract of land, the defendant arrived in a car in which the police discovered additional evidence of methamphetamine production. *Id.* at 995–96.

The district court found that attaching a GPS unit to a vehicle only required a reasonable suspicion that a defendant was engaged in criminal activity, and that police had reasonable suspicion to believe the defendant was engaged in the manufacturing of methamphetamine. *Id.* at 996. On appeal, the defendant argued that officers were required to obtain a warrant supported by probable cause prior to placing the GPS unit on his vehicle. *Id.* In contrast, the Government asserted that attaching a GPS unit to the defendant's car was not a search or seizure for purposes of the Fourth Amendment. *Garcia*, 474 F.3d at 996. After considering the "presumption that a warrant is required, unless infeasible, for a search to be reasonable," *id.* at 996, Judge Posner turned his attention to the issue of whether the action of attaching a GPS unit to a vehicle constituted a search or seizure within the meaning of the Fourth Amendment, *id.* at 996–98. The court quickly dismissed the defendant's argument that such an action rose to the level of a seizure. *Id.* at 996. Continuing, the court considered the defendant's claim that the installation of a GPS unit on a vehicle was a Fourth Amendment search. Starting with the Supreme Court's decision in *United States v. Knotts*, the court noted "that the mere tracking of a vehicle on public streets by means of a similar though less sophisticated device (a beeper) is not a search." *Garcia*, 474 F.3d at 996. Consistent with this holding, the court recognized that police could follow a

vehicle on public roads or track the route of a vehicle through cameras or satellite imaging on Google Earth without implicating the Fourth Amendment. *Id.* at 997. In the court's view, GPS tracking was like tracking through surveillance cameras or satellite imaging, and therefore, was not a search for purposes of the Fourth Amendment. *Id.* Acknowledging *Katz*'s command "that the meaning of a Fourth Amendment search must change to keep pace with the march of science," *id.*, the court distinguished the tracking of an individual suspect in a car from the "wholesale surveillance" allowed by means of GPS:

> One can imagine the police affixing GPS tracking devices to thousands of cars at random, recovering the devices, and using digital search techniques to identify suspicious driving patterns. One can even imagine a law requiring all new cars to come equipped with the device so that the government can keep track of all vehicular movement in the United States. It would be premature to rule that such a program of mass surveillance could not possibly raise a question under the Fourth Amendment-that it could not be a search because it would merely be an efficient alternative to hiring another 10 million police officers to tail every vehicle on the nation's roads.

*Id.* at 998. In conclusion, the court reiterated that the GPS tracking of the defendant was appropriate because it was not a program of mass surveillance and law enforcement had "abundant grounds" for suspecting the defendant of manufacturing methamphetamine. *Id.*

D.      **Suppression Is Not an Appropriate Remedy in This Case Because Law Enforcement Officers Relied in Good Faith on the Seventh Circuit's Binding Decision in *Garcia***

Law enforcement officers installed GPS units on the Defendants' vehicles and used those GPS units to track the Defendants' movements over the course of several months. Now, under *Jones*, we know that the installation of a GPS unit for the purpose of gathering information constitutes a search under the Fourth Amendment. At the time law enforcement officers installed GPS units and tracked the Defendants' movements in late 2010 and early 2011, however, no

such Supreme Court guidance was available to them. To the contrary, the Seventh Circuit in 2007 in *Garcia* clearly stated that the installation and use of GPS units to gather locational information did not implicate the Fourth Amendment as a search or seizure. At least three district courts have recognized *Garcia* as binding Seventh Circuit precedent regarding GPS surveillance. *See United States v. Rainone*, No. 09 CR 206, 2013 WL 2403600, at *2–3 (N.D. Ill. May 31, 2013) (citing *Garcia*, 474 F.3d at 996–97) ("[A]t the time officers installed the tracking device on Rainone's vehicle, Seventh Circuit precedent was that a warrant was not required."); *Judkins v. United States*, No. 12–C–0759, 2013 WL 1130484, at *2 (E.D. Wis. Mar. 18, 2013) (addressing prisoner's Fourth Amendment claims in habeas context and recognizing *Garcia* as binding precedent that allowed GPS tracking without a warrant); *United States v. Shelburne*, No. 3:11–cr–156–S, 2012 WL 2344457, at *5–6 (W.D. Ky. June 20, 2012) (applying Seventh Circuit precedent because acts occurred in Indiana and recognizing *Garcia* as binding precedent that allowed GPS tracking without a warrant). The Court agrees with these courts that, at the time of the investigation, *Garcia* was binding precedent that permitted warrantless installation and use of a GPS unit. Under the Supreme Court's holding in *Davis*, suppression of the evidence in this case is inappropriate because law enforcement officers reasonably relied on the Seventh Circuit's binding decision in *Garcia* at the time of their investigation of the Defendants.

The Defendants offer several arguments in opposition to this conclusion. First, the Defendants assert that *Garcia* is not analogous to the instant case. In the Defendants' view, the GPS surveillance in this case was so broad in its scope and of such lengthy duration as to place it beyond the court's holding in *Garcia*. The Government responds that the length of GPS surveillance was not considered relevant in *Garcia*. Further, the Government notes, the only exception to the Seventh Circuit's decision in *Garcia* was a potential system of wholesale

random surveillance. The Government emphasizes that no such wholesale random surveillance occurred here. In the Court's view, the Government's position is correct.

The court in *Garcia* analogized tracking a vehicle's location with a GPS to tracking a vehicle's location by cameras mounted on lampposts or satellite imaging through Google Earth. 474 F.3d at 997. Because those methods of surveillance were not Fourth Amendment searches, neither was surveillance by means of GPS. *Id.* Notably, the *Garcia* court made no reference to the length of the GPS surveillance at issue.[4] The court in *Garcia* withheld ruling on the Fourth Amendment implications of "wholesale surveillance," such as a case in which police randomly attached GPS units to thousands of cars and gathered the resulting data to "identify suspicious driving patterns" or a case in which a new law was passed requiring every vehicle in the United States to have a GPS unit to allow the government to monitor all vehicular movement. *Id.* at 998.

The Defendants' argument that *Garcia* is not analogous to the present case, and therefore not binding, is not persuasive. The length of GPS surveillance was never at issue in *Garcia*—a review of the underlying cases indicates that the length of the surveillance was never established at the district court level and the panel opinion makes no reference it. The Defendants maintain that GPS surveillance in their case was so pervasive as to place it outside the holding in *Garcia*, but the facts do not support that conclusion. Pervasive GPS surveillance, in the view of the *Garcia* court, occurs when thousands of randomly selected vehicles are tracked by GPS units or when a law is passed mandating that all vehicles include GPS units to allow the Government to track those vehicles. *See Garcia*, 474 F.3d at 998. Here, law enforcement officers attached GPS

---

[4] The underlying district court decisions do not indicate how long the GPS surveillance lasted in that case. *See United States v. Garcia*, No. 05-CR-0155-C-01, 2006 WL 1601716 (W.D. Wis. May 31, 2006); *United States v. Garcia*, No. 05-CR-155-C, 2006 WL 1294578 (W.D. Wis. May 10, 2006); *United States v. Garcia*, No. 05-CR-0155-C-01, 2006 WL 6020948 (W.D. Wis. Feb. 16, 2006); *United States v. Garcia*, No. 05-CR-155-C, 2006 WL 298704 (W.D. Wis. Feb. 3, 2006).

units to the Defendants' vehicles following extensive investigation and corroboration of their involvement in drug trafficking. The GPS units were not attached randomly without cause or on the scale described in *Garcia*.

Second, the Defendants argue that the good faith exception should not apply in this case because the *Jones* majority decided the case based on the pre-*Katz* common law trespass test whereas *Garcia* relied on *Katz*'s reasonable expectation of privacy test. Because the Seventh Circuit ignored the pre-*Katz* trespass test and incorrectly applied the *Katz* reasonable expectation of privacy test in *Garcia*, the Defendants maintain that *Davis's* good faith exception is not applicable in the present case. The Court finds this argument to be unavailing.

That the Seventh Circuit's Fourth Amendment analysis in *Garcia* was incorrect does not weigh in favor of application of the exclusionary rule. The purpose of the exclusionary rule is to deter police misconduct, *Davis*, 131 S. Ct. at 2428, not to punish law enforcement officers for the mistakes of judges, magistrates, legislators, or administrators. "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" *Id.* at 2429 (alteration in original) (quoting *Herring*, 555 U.S. at 144).

The Supreme Court's decision in *Davis* was designed to protect and encourage law enforcement officers' good faith reliance on binding precedent, *United States v. Baker*, — F.3d —, 2013 WL 2631726, at *7 (4th Cir. June 13, 2013), and here, law enforcement officers followed the Seventh Circuit's *Garcia* precedent "to the letter," *Davis*, 131 S. Ct. at 2428. Law enforcement officers should not be punished for the errors of judges, *Leon*, 468 U.S. at 916, and excluding the evidence gathered by law enforcement officers through GPS surveillance conducted in a manner consistent with *Garcia* would yield no meaningful deterrence in this case.

Further, given its significant cost to the judicial system and the lack of police culpability in this case, exclusion is not an appropriate remedy based on the record before the court.

Third, the Defendants cite *United States v. Real Property Located at 15324 County Highway E.*, 332 F.3d 1070 (7th Cir. 2003) (hereinafter *Real Property*), and argue that "[t]he Seventh Circuit has specifically refused to extend the good faith exception to cases . . . where police, in the absence of magistrate approval by way of a search warrant, seized evidence 'in naked reliance upon subsequently overruled case law.'" (Defs.' Reply 5, ECF No. 210.) In *Real Property*, the owner of a home subject to civil forfeiture moved to suppress evidence of marijuana manufacturing and distribution discovered by law enforcement through the use of a thermal imaging device. Relying on the Seventh Circuit's decision in *United States v. Myers*, 46 F.3d 668, 669 (7th Cir. 1995), which held that "thermal imaging scanning does not constitute a search within the meaning of the Fourth Amendment," the district court denied the defendant's motion to suppress. *Real Property*, 332 F.3d at 1072–73. While his appeal was pending, the Supreme Court decided *Kyllo v. United States*, 533 U.S. 27, 36 (2001), finding that warrantless "thermal-imaging observations of the intimate details of a home are impermissible" under the Fourth Amendment. The Seventh Circuit therefore vacated the district court's judgment and remanded the case for reconsideration in light of *Kyllo*. *Real Property*, 332 F.3d at 1073. On remand, the district court again denied the defendant's motion to suppress. *Id.* Finding that the officers conducting the thermal-imaging search reasonably relied on the Seventh Circuit's decision in *Myers*, the district court determined that the reasoning in *Illinois v. Krull*, 480 U.S. 340 (1987), permitted the application of the good faith exception to the exclusionary rule in the defendant's case. *Real Property*, 332 F.3d at 1073.

On appeal, the Seventh Circuit rejected the district court's decision to extend the

reasoning of *Krull*:

> We decline to extend further the applicability of the good-faith exception to evidence seized during law enforcement searches conducted in naked reliance upon subsequently overruled case law—as distinguished from the subsequently invalidated statute at issue in *Krull*—absent magistrate approval by way of a search warrant. Such expansion of the good-faith exception would have undesirable, unintended consequences, principal among them being an implicit invitation to officers in the field to engage in the tasks—better left to the judiciary and members of the bar more generally—of legal research and analysis.

*Id.* at 1076.[5] In short, even if law enforcement officers relied on binding circuit precedent at the time of a Fourth Amendment search later determined to be unconstitutional, that *did not* warrant the application of the good faith exception to the exclusionary rule. After the Supreme Court's decision in *Davis*, the Seventh Circuit's decision in *Real Property* on this point is no longer good law. As previously noted, the *Davis* Court found that "when binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities," 131 S. Ct. at 2429 , and, therefore, held that a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule, *id.* In light of *Davis*, *Real Property* offers no support for the Defendants' argument.

Finally, the Defendants challenge the application of the good faith exception in this case on retroactivity grounds. Citing *United States v. Johnson*, 457 U.S. 537 (1982), and *Griffith v. Kentucky*, 479 U.S. 314 (1987), the Defendants argue that the Supreme Court's decision in *Jones* should apply to them retroactively. "[A] decision of [the Supreme Court] construing the Fourth

---

[5]Although the Court of Appeals disagreed with the district court's reasoning, the Seventh Circuit affirmed the district court's denial of the defendant's motion to suppress on alternative grounds, applying *Leon*'s good faith exception because law enforcement agents acted in objectively reasonable reliance upon a validly issued search warrant that rested on a "constitutionally flawed probable cause finding owing to a subsequent change in controlling judicial precedent." *Id.*

Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered," *Johnson*, 457 U.S. at 562, even if the decision constitutes a "clear break" with past precedent, *Griffith*, 479 U.S. at 328. In *Davis*, the Supreme Court discussed the relationship between the good faith exception and its retroactivity jurisprudence. 131 S. Ct. at 2430–31. Writing for the majority, Justice Alito distinguished between the doctrine of retroactivity and the question of the appropriate remedy for a Fourth Amendment violation:

> Our retroactivity jurisprudence is concerned with whether, as a categorical matter, a new rule is available on direct review as a *potential* ground for relief. Retroactive application under *Griffith* lifts what would otherwise be a categorical bar to obtaining redress for the government's violation of a newly announced constitutional rule. Retroactive application does not, however, determine what "appropriate remedy" (if any) the defendant should obtain. Remedy is a separate, analytically distinct issue. As a result, the retroactive application of a new rule of substantive Fourth Amendment law *raises* the question whether a suppression remedy applies; it does not answer that question.

*Id.* (internal citations omitted). With this distinction in mind, the majority recognized that the defendant could invoke *Gant* retroactively as a basis for relief *subject to the exclusionary rule and its exceptions*. *Id.* at 2431. The Court then turned its attention to the issue of remedy, finding that the application of the good faith exception did not deny retroactive effect to *Gant*. *Id.*

Here, the Defendants' retroactivity concerns are misplaced. The Defendants have appropriately invoked *Jones* as a basis for relief in this case, but *Jones* does not dictate the appropriate remedy in this case. *See Davis*, 131 S. Ct. at 2430–31. Law enforcement officers reasonably relied on the Seventh Circuit's decision in *Garcia* in conducting GPS surveillance of the Defendants. Consequently, under the *Davis* good faith exception, exclusion is not the proper remedy in this case. This conclusion is consistent with the Supreme Court's retroactivity jurisprudence, *id.* at 2431, and *Davis*'s good faith exception.

E.      **Inevitable Discovery and Independent Source Exceptions**

Although the Court finds that the good faith exception applies in this case, the Court will briefly consider the Government's alternative arguments. The Government argues that the independent source and inevitable discovery exceptions should apply in this case. In the Government's view, the evidence acquired through the wiretaps and visual surveillance of the Defendants was obtained by independent legal means. Further, the Government contends, any information gathered through the use of GPS surveillance would inevitably have been discovered through wiretaps or visual surveillance. In response, the Defendants assert that the independent source and inevitable discovery exceptions do not apply in this case. According to the Defendants, "the use of the GPS trackers was inextricably intertwined with the telephone monitoring and physical surveillance." (Defs.'s Reply 17.) Because the Government relied upon a combination of visual surveillance, confidential informants, wiretaps, *and* GPS surveillance, the Defendants argue that independent source and inevitable discovery exceptions cannot apply.

Describing the purpose of the exclusionary rule in *Nix v. Williams*, the Supreme Court stated:

> the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred. When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

467 U.S. 431, 443 (1984) (citations omitted). "Evidence is not automatically tainted 'simply because it would not have come to light but for the illegal actions of the police.'" *United States v. Meece*, 580 F.3d 616, 619 (7th Cir. 2009) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)). "Neither is all evidence inadmissible that 'somehow came to light through a

chain of causation that began with [illegal police activity].'" *Meece*, 580 F.3d at 619 (quoting

*United States v. Ceccolini*, 435 U.S. 268, 276 (1978)). To avoid the exclusion of evidence, "the

independent source doctrine allows the admission of 'evidence initially discovered during an

unlawful search if the evidence was discovered later through a source untainted by the initial

illegality.'" *United States v. Moody*, 664 F.3d 164, 167 (7th Cir. 2011) (quoting *United States v.*

*Gonzalez*, 555 F.3d 579, 581 (7th Cir. 2009)). Exclusion is not an appropriate remedy if the

evidence at issue "was obtained by independent legal means." *Moody*, 664 F.3d at 167 (quoting

*United States v. May*, 214 F.3d 900, 906 (7th Cir. 2000)). Similarly, "[u]nder the inevitable

discovery doctrine, illegally seized evidence need not be suppressed if the government can prove

by a preponderance of the evidence that the evidence inevitably would have been discovered by

lawful means." *United States v. Pelletier*, 700 F.3d 1109, 1116 (7th Cir. 2012) (citing *Nix*, 467

U.S. at 442–44.) To satisfy this evidentiary burden, the Government must present evidence

demonstrating (1) "that it had, or would have obtained, an independent, legal justification for

conducting a search that would have led to the discovery of the evidence"; and (2) "that it would

have conducted a lawful search absent the challenged conduct." *Pelletier*, 700 F.3d at 1116

(quoting *United States v. Marrocco*, 578 F.3d 627, 637–38 (7th Cir. 2009)).

    The record before the Court supports the application of the independent source exception.

Throughout their investigation, Task Force officers primarily relied upon wiretaps of the

Defendants' cellphones and visual surveillance. The wiretaps were executed in compliance with

Title III and the Defendants do not dispute that their use was legal. Nor do the Defendants argue

that Task Force officers' visual surveillance was illegal. While the Task Force officers involved

in the investigation of this case conceded that they relied on GPS surveillance on multiple

occasions to assist with surveillance, they emphasized that the vast majority of their evidence

was collected through wiretaps and visual surveillance, independent of any GPS surveillance. Further, the Task Force officers indicated that they did not intend to introduce any evidence that was collected through GPS surveillance. In light of this record, the Court finds that almost all of the evidence gathered during the investigation "was obtained by independent legal means," *Moody*, 664 F.3d at 167 (quoting *May*, 214 F.3d at 906),— i.e. the wiretaps, visual surveillance, and search warrants for residences in which the Defendants stored narcotics. Here, the Defendants have not identified particular evidence that they believe should be suppressed. Rather, the Defendants argue in broad terms that the use of GPS surveillance effectively tainted *all* of the evidence that the Government collected in this case. However, the Court has already found that most of the evidence gathered during the investigation was obtained legally through the wiretaps and visual surveillance. To the extent that any evidence was collected through the use of GPS surveillance, the Defendants have failed to establish a causal nexus between the alleged illegal search of the Defendants' vehicles and any specific evidence that was not independently discovered through the wiretaps and visual surveillance. For these reasons, the Court would find that exclusion is not justified in this case. [6]

## CONCLUSION

[6] The Government raises the automobile exception as another basis for denying the Defendants' Motions. Mindful of its position as a district court and considering the uncertainty surrounding *Jones*, the Court declines to find that the automobile exception is an appropriate alternative basis to deny the Defendants' Motions. *See United States v. Sparks*, 711 F.3d 58, 62 (1st Cir. 2013) (discussing cases in which courts rejected the Government's attempts to fit GPS tracking within the Fourth Amendment's automobile exception); *see also United States v. Ortiz*, 878 F. Supp. 2d 515, 535–36 (E.D. Pa. 2012) (declining to apply the automobile exception to permit warrantless GPS installation and monitoring); *United States v. Ford*, No. 11–CR–42, 2012 WL 5366049, at *8 (E.D. Tenn. Oct. 30, 2012) (finding that the underlying rationale for the automobile exception did not support its application in cases involving warrantless GPS installation and tracking); *United States v. Katzin*, No. 11–226, 2012 WL 1646894, at *6 (E.D. Pa. May 9, 2012) ("The rationale underlying the automobile exception does not justify the warrantless installation of a GPS tracker").

For the foregoing reasons, the Court DENIES the Defendants' Motions to Suppress [ECF Nos. 125, 128, & 134]. A telephone final pretrial conference is set for July 9, 2013, at 9:45 AM before Judge Theresa L. Springmann. The Court will initiate the call. Any plea agreement in this matter shall be filed by the time of the telephonic final pretrial conference. The three (3) week jury trial is scheduled to begin on July 22, 2013, at 8:30 AM before Judge Theresa L. Springmann.

SO ORDERED on July 2, 2013.

      s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT